# IN THE SUPREME COURT OF IOWA

No. 11–0157

Filed April 29, 2011

**IOWA SUPREME COURT
ATTORNEY DISCIPLINARY BOARD,**

Complainant,

**vs.**

**KENNETH F. DOLEZAL,**

Respondent.

On review of the report of the Grievance Commission of the Supreme Court of Iowa.

Grievance commission recommends a thirty-day suspension of attorney's license to practice law. **LICENSE SUSPENDED.**

Charles L. Harrington and David J. Grace, Des Moines, for complainant.

Kenneth F. Dolezal, Cedar Rapids, pro se.

**MANSFIELD, Justice**.

This attorney disciplinary proceeding comes before us on the report of a division of the Grievance Commission of the Supreme Court of Iowa. *See* Iowa Ct. R. 35.10(1). The Iowa Supreme Court Attorney Disciplinary Board alleged the respondent, Kenneth F. Dolezal, violated ethical rules by neglecting three clients' matters, failing to deposit fees into a client trust account, failing to provide an accounting, failing to communicate with a client, making misrepresentations to a client, and improperly terminating representation of a client.

The commission found Dolezal violated several of the Iowa Rules of Professional Conduct and recommended Dolezal be suspended from the practice of law for thirty days. The commission further recommended Dolezal be required to submit a report from a qualified physician or mental health professional stating he is presently fit and capable to practice prior to reinstatement and attend a continuing legal education class on trust accounting. Upon our consideration of the commission's findings of fact, conclusions of law, and recommendation, we find Dolezal committed several violations of the Iowa Rules of Professional Conduct and suspend his license for thirty days.

## I. Scope of Review.

We review attorney disciplinary proceedings de novo. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Fields*, 790 N.W.2d 791, 793 (Iowa 2010). We give respectful consideration to the commission's findings and recommendations, but we are not bound by them. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Lickiss*, 786 N.W.2d 860, 864 (Iowa 2010). "The board has the burden of proving attorney misconduct by a convincing preponderance of the evidence." *Id.*

## II. Ethical Violations.

Dolezal was admitted to the bar in 1983 and maintains a law office in Linn County. This proceeding is based on Dolezal's handling of three separate legal matters between 2008 and 2010. We will set forth our findings and conclusions with respect to each matter.

**A. Conservatorships of Wesley and Lenora Buresh.** The first matter involves Dolezal's failure, despite repeated warnings, either to pursue or dismiss two appeals before this court.

In approximately 2007, Dolezal was retained by the daughter of Wesley and Lenora Buresh to represent her in connection with the Bureshes' conservatorships. On March 26, 2008, Dolezal filed a notice of appeal challenging a district court ruling. He subsequently filed a combined certificate and paid the docketing fee but did nothing thereafter. On August 6, 2008, Dolezal was found in default and personally assessed a $50 penalty for failing to timely file a proof brief and designation of appendix in this court.

On August 22, 2008, Dolezal paid the penalty and also applied for an extension of time to file the brief and designation. The extension of time was granted, but on October 16, 2008, Dolezal was again found in default for not filing the proof brief and designation and assessed another $50 fine. Dolezal paid the fine as before but, again, asked for another extension. On March 17, 2009, an order was entered directing the proof brief and designation of appendix to be filed within thirty days or the case would be dismissed. No brief or designation was filed, so on May 5, 2009, a notice of default was issued, and Dolezal was personally assessed another $50 fine. That default was not cured, and the appeal was dismissed by our clerk of court on June 5, 2009, over a year after it had been initiated.

On May 26, 2009, Dolezal filed a second notice of appeal. This appeal related only to the conservatorship of Lenora Buresh, Wesley Buresh having died. Dolezal, however, did not pay the filing fee for this appeal. *See* Iowa R. App. P. 6.102(3). On September 11, 2009, Dolezal received written notice that the $150 fee needed to be paid within seven days to avoid penalty. The fee was still not paid. On October 2, 2009, a notice of default was issued based on failure to pay the filing fee, and Dolezal was personally assessed a $150 fine. This notice of default, like the default notice from the previous appeal, specifically stated in bold:

> **You are advised that if the appeal is dismissed as a result of counsel's failure to comply with this default notice, a copy of the dismissal order will be forwarded to the Iowa Supreme Court Attorney Disciplinary Board . . . . The dismissal may serve as grounds for an investigation of neglect of a client's legal matter.**

This default also was not cured, so on November 10, 2009, the second appeal was dismissed by our clerk of court for want of prosecution.

At the grievance hearing, Dolezal sought to explain his actions. He testified that he and his client jointly decided it was not necessary to pursue either appeal. He also explained that he, not his client, paid the penalties assessed by the clerk. Finally, Dolezal admitted he had received the default notices and never responded to them. He acknowledged he should have dismissed the appeals on his own, but claimed he was unaware that he had to do so instead of relying upon the clerk.

When an attorney's failure to comply with appellate deadlines results in an administrative dismissal, his actions are prejudicial to the administration of justice. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Wright*, 758 N.W.2d 227, 230–31 (Iowa 2008) (finding an attorney's

reliance on a default notice to dismiss an appeal when his client could not raise funds for the filing of the transcript was conduct prejudicial to the administration of justice); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Tompkins*, 733 N.W.2d 661, 668 (Iowa 2007) (finding an attorney committed neglect and acted in a manner prejudicial to the administration of justice when he failed to prosecute or move to dismiss an appeal he believed to be without merit); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Lesyshen*, 712 N.W.2d 101, 105 (Iowa 2006) ("To simply wait for the court to dismiss the case for lack of prosecution is neglect, inappropriate, and unethical."); *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Daggett*, 653 N.W.2d 377, 380 (Iowa 2002) (failing to comply with appellate deadlines "not only constitutes neglect, but also amounts to conduct that is prejudicial to the administration of justice").

Dolezal conceded he failed to cure the defaults. Instead, he relied on the clerk to administratively dismiss both appeals. But a client's decision not to pursue an appeal does not put an end to the attorney's responsibility for that matter. *See Tompkins*, 733 N.W.2d at 668 ("The burden is on the attorney to comply with the appellate deadlines regardless of a client's instruction or interest in the case."); *Lesyshen*, 712 N.W.2d at 105 ("[S]imply because a client does not want to pursue the case does not relieve the attorney from taking steps necessary to end the matter."). Dolezal's failure to follow through with or dismiss the appeals and his disregard of the default notices violated ethical rules 32:3.2 (requiring reasonable efforts to expedite litigation) and 32:8.4(d) (requiring conduct not be prejudicial to the administration of justice). *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Knopf,* 793 N.W.2d 525, 530 (Iowa 2011) (holding that "[i]gnoring deadlines and orders, which results in default notices from the clerk of court, hampers the ' "efficient

and proper operation of the courts" ' and therefore is prejudicial to the administration of justice" (quoting *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Howe*, 706 N.W.2d 360, 373 (Iowa 2005))); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Monroe*, 784 N.W.2d 784, 788 (Iowa 2010) (stating that acts prejudicial to the administration of justice generally have " 'hampered the efficient and proper operation of the courts or of ancillary systems upon which courts rely' " (quoting *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Borth*, 728 N.W.2d 205, 211 (Iowa 2007))); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Hoglan*, 781 N.W.2d 279, 284 (Iowa 2010) (holding an attorney's failure to prosecute four appeals violated rules 32:1.3, 32:3.2, and 32:8.4(d)).

The commission found that Dolezal's conduct also violated rule 32:1.3 requiring "reasonable diligence and promptness in representing a client." In a case decided under the former Iowa Code of Professional Responsibility for Lawyers, we held that even if a client no longer wants a matter to be pursued, it is neglect for the attorney to allow the matter to languish, without terminating it. *See Lesyshen*, 712 N.W.2d at 105. As we put it in *Lesyshen*:

> [S]imply because a client does not want to pursue the case does not relieve the attorney from taking steps necessary to end the matter. To simply wait for the court to dismiss the case for lack of prosecution is neglect, inappropriate, and unethical. *See* DR 6–101(A)(3).

*Id.* We see no reason to interpret rule 32:1.3 differently from former DR 6–101(A)(3) in this respect. The new rule provides that a lawyer "shall act with reasonable diligence and promptness in representing a client"; the old rule provided that a lawyer shall not "neglect a legal matter entrusted to him." Thus, both rules are broadly worded to require diligence, or conversely to prohibit neglect, in the course of legal work on

a client's behalf. It is not a defense under either rule that the client may be indifferent to the attorney's lack of diligence.

**B. Social Security Disability Claim of Michael David.** This attorney disciplinary proceeding also concerns Dolezal's representation of a client in a social security disability appeal to federal district court. To summarize our findings, which we discuss in more detail below, Dolezal received a retainer from his client and filed the federal court complaint, but did not have the complaint served (resulting in dismissal of the case), did not communicate adequately with his client, and did not handle the retainer funds appropriately.

In March 2006, Dolezal was hired by Michael David to pursue a social security disability claim. After receiving unfavorable rulings in the Social Security Administration's administrative process, Dolezal wrote David suggesting the matter be appealed to the United States District Court for the Northern District of Iowa.[1] Dolezal's letter dated December 27, 2007, stated:

> I believe it should be appealed to the U.S. District Court but there is now a financial cost. You would need to deposit $1,000.00 in my trust account for payment of filing fees, brief preparation costs and attorneys fees. This must be accomplished by February 8, 2008 if you want me to proceed.

On or about January 17, 2008, David made an initial payment of $500 to Dolezal by check and agreed to pay an additional $100 monthly through June 2008 to bring the total to $1000. This payment plan was memorialized in a writing that further provided, "These funds will be

---

[1]On June 29, 2007, while David's original application for benefits was before the Social Security Appeals Council, the Social Security Administration granted David's subsequent, pro se application for disability benefits. This ruling meant that David would be entitled to receive benefits beginning August 2007. However, David still had his original claim, prosecuted by Dolezal, for disability benefits for an earlier time period.

used to pay the court required filing fees, the service of process fees, my time at the rate of $175 per hour and copy or printing expenses." Dolezal testified he put the $500 check in a file and left it there until he filed the federal court complaint.

On March 13, 2008, Dolezal filed the complaint in federal district court.[2] At that time, according to Dolezal's testimony, he cashed the check and used $350 for the filing fee while keeping the remainder as attorney fees. David provided additional checks to Dolezal in February 2008 ($100), May 2008 ($200), and October 2008 ($100). Dolezal did not place any of these payments into a trust account; presumably, they were also cashed and treated by Dolezal as income. In addition, David claims he paid $100 in cash to Dolezal, stating, "I thought I dropped it off." However, David has no receipt for this alleged cash transaction.

Although Dolezal filed the complaint, he never had it served on the Commissioner. As a result, on February 25, 2009, the federal district court issued a notice stating the case would be dismissed unless some action was taken by March 16, 2009. No action was taken, and the case was dismissed.

According to Dolezal, shortly after the federal court complaint was filed in March 2008, David provided a transcript of a deposition he had given in December 2005 in a workers' compensation case. Dolezal testified that after reading the deposition transcript, he concluded David had made several misrepresentations to him. Dolezal testified that "a very heated discussion" ensued during which he orally terminated his

---

[2]The board maintained that Dolezal's filing of the complaint was untimely, but Dolezal testified he would have been able to get a retroactive extension of the filing deadline if he and his client had decided to pursue the matter. Dolezal claimed that he did not regularly handle social security appeals and that he and his secretary had some difficulty mastering the e-filing requirements.

representation of David and told David to find new counsel. Dolezal admitted he did not send a letter to David confirming the termination of their relationship, nor did he file a motion to withdraw as counsel with the federal district court. Dolezal further testified that he did not speak with David again until he came to his office in January 2010.

David, who also testified at the grievance hearing, denied that this argument had occurred or that the attorney-client relationship had been terminated. Rather, while acknowledging that he was "not very good with the dates," David testified his meeting with Dolezal in January 2010 was his first news about the case since its filing. David characterized that meeting as follows:

> I went to the office and I said, what's going on? He said, let me get my laptop, and I'll look it up. He got his laptop, and he came back to the desk, and he looked for a while, and he said, if I recollect – if I recollect right, he said you've been denied. And I said, okay. Why didn't you get a hold of me so we could appeal it again, because you said there's another appeal process? He really didn't answer me. He just looked down, and that was about it. He just didn't say nothing to me, why or what happened; it was just that that's it. You can't appeal it no more, or I was denied, one or the other, so I just left.

David also testified that he referred his brother to Dolezal for representation in October 2009. Finally, David testified he had retained an attorney for the potential purpose of filing a malpractice case against Dolezal.

Upon our de novo review, we are not persuaded by a convincing preponderance of the evidence that Dolezal misrepresented the status of the case to David. The commission found, "Mr. David testified that he would try and call [Dolezal] during 2008 and 2009 regarding the case and was told it would take awhile, that he had not heard anything, and [Dolezal] would find out." David's actual testimony, however, was that

once, in 2008, Dolezal said the case was "going to take a while" and much later, in December 2009 or January 2010, Dolezal promised to find out about the case but never got back to David, prompting David to make the January 2010 trip to Dolezal's office. Given David's actual testimony, and his admissions to being "forgetful" and "forget[ting] a lot of things," we are not able to find that Dolezal misled his client. Yet, Dolezal's claim that he orally terminated the attorney-client relationship shortly after March 13, 2008, does not square with events either. Dolezal did nothing at the time to withdraw from the district court case or to protect his client's interests therein. Dolezal also did not send a letter to David confirming the *termination* of representation, despite having previously sent David letters confirming the *terms* of representation. In addition, after the alleged termination, David continued to make installment payments, Dolezal continued to accept them, and David also referred his brother to Dolezal for representation. It seems odd that all of these things would have occurred if Dolezal had actually "fired" David after learning of David's alleged dishonesty.

Thus, we find Dolezal continued to represent David, but neglected his case, with the result that it was involuntarily dismissed for failure to effect timely service. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Thomas*, 794 N.W.2d 290, 293–94 (Iowa 2011) (holding that failure to effect service within the prescribed time period constitutes neglect). David lost his right of appeal to federal court, and the court was forced to expend resources unnecessarily before dismissing David's stale appeal. The neglect was further compounded by Dolezal's failure to keep David informed of the case's status. By his own admission, Dolezal went almost two years without speaking to David, and all attempts at communication after early 2008 were initiated by David. Accordingly, we

find sufficient proof that Dolezal violated rules 32:1.3 (requiring reasonable diligence and promptness), 32:1.4 (requiring reasonable communication with client), 32:3.2 (requiring reasonable efforts to expedite litigation consistent with the interests of the client), and 32:8.4(d) (requiring conduct not be prejudicial to the administration of justice). *See Thomas*, 794 N.W.2d at 293–94 (finding violations of rules 32:1.3, 32:1.4, and 32:8.4(d)); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Johnson*, 792 N.W.2d 674, 681 (Iowa 2010) (finding that an attorney's failure to make necessary filings in bankruptcy case—resulting in a motion to dismiss and a court hearing—and his failure to keep clients informed violated rules 32:1.3, 32:1.4, 32:3.2, and 32:8.4(d)). As previously noted, we do not find a clear preponderance of evidence establishes a misrepresentation by Dolezal to his client in violation of rule 32:8.4(c). In addition, because we find that Dolezal did not terminate his representation of David in early 2008, and instead continued to serve as his counsel in the federal appeal, we do not find a violation of rule 32:1.16(d) (requiring certain procedures when terminating client representation).[3]

This brings us to Dolezal's trust account violations. In his initial December 2007 letter, Dolezal agreed to perform the specific service of appealing David's claim to the federal district court for a predetermined amount of $1000. This was a "flat fee" arrangement. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Piazza*, 756 N.W.2d 690, 697 (Iowa 2008) (discussing the concept of a "flat fee"); *see also* Iowa Ct. R. 45.10(1) (defining a "flat fee" as "one that embraces all services that a lawyer is to

---

[3]Notably, even if Dolezal's testimony were accepted in its entirety, he still failed to terminate his representation of David properly. As Dolezal put it, "My problem, as I see it, with the David case is I did not send him a letter, okay, confirming that I was no longer representing him."

perform, whether the work be relatively simple or complex"). "A flat fee is 'nothing more than an advance fee payment which . . . must be deposited in a client trust account.'" *Piazza*, 756 N.W.2d at 697 (quoting *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Apland*, 577 N.W.2d 50, 56 (Iowa 1998)); *accord* Iowa Ct. R. 45.10(2). "[A] flat fee . . . is earned when the services are *completed* and therefore requires deposit in a client trust account coupled with a contemporaneous accounting to the client prior to withdrawal of such fees from the trust account." *Piazza*, 756 N.W.2d at 698. This is because, "[u]ntil services are complete, it is possible that at least a portion of the fee 'would need to be refunded to the client in the event the attorney-client relationship is terminated before the services were rendered.'" *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Kennedy*, 684 N.W.2d 256, 260 (Iowa 2004) (quoting *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Frerichs*, 671 N.W.2d 470, 476 (Iowa 2003)). Arguably, in his second letter of January 2008, Dolezal qualified his earlier description of the fee arrangement by stating that he would bill for his time at $175 per hour. Still, we believe the only reasonable interpretation of the two letters would leave the overall amount paid by David subject to a $1000 cap. (The second letter reiterates that $1000 is the amount "required to pursue the appeal of your case to the U.S. District Court.") And if anything, the second letter confirms that Dolezal would only earn fees as he performed work on the case.

It is undisputed that Dolezal received a $500 check from David before performing any services. Dolezal testified he did not cash the check, but kept it in a file until he had prepared and filed the four-page federal appeal and incurred the $350 filing fee. At that time, he treated the remaining $150 as income he had earned through his work on the federal appeal. He took the same position with respect to the subsequent

installment payments totaling $400, which he also took as income. Neither the board nor the commission questioned Dolezal's contentions that he had earned these funds; however, they faulted Dolezal for not opening a trust account, for not initially depositing the payments into a trust account, and for not providing an accounting and notice to his client of how the client's funds were being used.[4]

We agree that Dolezal should have deposited the funds in a trust account, as he said he would do in his December 2007 letter to David, and should have provided an accounting to David for the use of the funds. These actions were required by rule 32:1.15 and rule 45.7. *See* Iowa Ct. R. 32:1.15(a), (c) (requiring complete records of trust account funds to be kept and requiring advance payments of fees and expenses to be deposited into a client trust account); Iowa Ct. R. 45.7(4) (requiring the lawyer to provide an accounting and notice to the client when withdrawing advance fee or expense payments); Iowa Ct. R. 32:1.15(f) (incorporating chapter 45 of the Iowa Court Rules); *see also Iowa Supreme Ct. Att'y Disciplinary Bd. v. Hauser*, 782 N.W.2d 147, 152–53 (Iowa 2010) (finding violations of rules 32:1.15 and 45.7 when a lawyer did not properly maintain trust records justifying withdrawals of payments to himself and did not provide an accurate accounting to his client); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Carpenter*, 781 N.W.2d 263, 269 (Iowa 2010) (finding violations of rules 32:1.15 and 45.7 when a lawyer received advance fee retainers, failed to deposit them in a client trust account, and failed to properly account for them).

---

[4]Dolezal testified that, after his client complained to the board, he prepared a statement recreating his time and showing that he had earned his fees.

**C. Estate of Steven M. Carter.** The final subject of this proceeding is a probate proceeding in which Dolezal failed to file required reports or explain to the court why he was unable to do so.

In October 2006, Dolezal was retained by Gene Carter, the administrator of the estate of Steven Carter (Gene's father). No question has been raised about Dolezal's initial work on the case, including his successful defense of an appeal. *See In re Estate of Carter*, No. 08–0344, 2008 WL 5235574 (Iowa Ct. App. Dec. 17, 2008). However, following the issuance of procedendo by the appellate court on January 16, 2009, Dolezal took no further action in the still pending case in the district court. Dolezal received notices of delinquency from that court on or about June 1, 2009, and December 1, 2009. Each notice specified the failure to file the interlocutory report within sixty days could result in a report being made to the Iowa Supreme Court Attorney Disciplinary Board. *See* Iowa Ct. R. 7.6. Nonetheless, Dolezal took no action.

On or about March 11, 2010, Dolezal received a notice directing both him and Gene Carter to appear in person at a show-cause hearing on April 27, 2010. Dolezal came to the hearing, but his client did not. As a result of that hearing, the district court again ordered an interlocutory report to be filed within sixty days. However, to date, no interlocutory or final reports have been filed with the district court, and the estate has not been closed.

Dolezal testified that the estate is still open because Gene Carter absconded with funds from the estate and he has been unable to locate him. However, Dolezal admitted that he has never raised this issue with the district court in writing nor sought to withdraw from representation due to a lack of cooperation. In addition, although the notices of delinquency mailed to Carter were returned to sender, Carter filed an

address change with the district court in September 2010. Despite this filing, Dolezal has still not made any attempts to contact Carter at the new address.

The failure to close an estate in a timely fashion, despite repeated delinquency notices, constitutes neglect. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Marks*, 759 N.W.2d 328, 331 (Iowa 2009) (finding that an attorney committed professional neglect under the prior DR 6–101(A)(3) when he did not sell a piece of real estate or close the estate allegedly because he could not locate the administrator). In addition, such inaction results in unnecessary oversight by the clerk of court and judicial officers that is prejudicial to the administration of justice. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Curtis*, 749 N.W.2d 694, 701 (Iowa 2008). Based on the foregoing, we find a convincing preponderance of the evidence shows violations of rules 32:1.3 (requiring reasonable diligence and promptness), 32:3.2 (requiring reasonable efforts to expedite litigation), and 32:8.4(d) (requiring conduct not be prejudicial to the administration of justice). *See Lickiss*, 786 N.W.2d at 867 (dilatory handling of four estates violated rules 32:1.3, 32:3.2, and 32:8.4(d)); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Ackerman*, 786 N.W.2d 491, 495–96 (Iowa 2010) (dilatory handling of two estates violated rules 32:1.3 and 32:8.4(d)).

## III. Discipline.

"There is no standard sanction for a particular type of misconduct, and though prior cases can be instructive, we ultimately determine an appropriate sanction based on the particular circumstances of each case." *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Earley*, 729 N.W.2d 437, 443 (Iowa 2007). In determining an appropriate sanction, we consider

the nature of the violations, the attorney's fitness to continue in the practice of law, the protection of society from those unfit to practice law, the need to uphold public confidence in the justice system, deterrence, maintenance of the reputation of the bar as a whole, and any aggravating or mitigating circumstances.

*Iowa Supreme Ct. Att'y Disciplinary Bd. v. Ireland*, 748 N.W.2d 498, 502 (Iowa 2008).

As discussed above, this case involves primarily neglect and related conduct prejudicial to the administration of justice. "In general, the sanction imposed when neglect is the principal violation can range from a public reprimand to a six-month suspension." *Thomas*, 794 N.W.2d at 294. The sanction imposed in a particular instance often depends upon whether there are multiple instances of neglect, a history of past disciplinary problems, and other companion violations. *Fields*, 790 N.W.2d at 798. Another important consideration is the harm caused by the neglect. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Casey*, 761 N.W.2d 53, 61 (Iowa 2009).

In this case, Dolezal has neglected three client matters—Buresh, David, and Carter. Moreover, Buresh could be considered two separate matters because it involved two different appeals approximately a year apart from each other. Although Dolezal's conduct in the Buresh and Carter proceedings did not result in harm to his clients, the neglect in the David matter led to the dismissal of David's appeal. Dolezal's neglect in the David matter was coupled with trust account violations. The violations involved a relatively small amount of money ($900), and the record does not establish that Dolezal failed to earn the fees, just that he did not handle the funds properly.

Dolezal also has a history of past disciplinary problems. He was privately admonished in October 2009 for failing to respond to

delinquency notices in another guardianship/conservatorship. In addition, Dolezal was privately admonished in the early 1990s for an advertising violation and for acquiring a security interest in the property of a client that was part of the subject matter of his representation. The latter two ethical violations occurred many years ago and do not appear to be similar to Dolezal's more recent ethical lapses.

Dolezal's right to practice also was suspended in 1991 for noncompliance with both continuing legal education requirements and client security requirements. This conduct, although it occurred some time ago, is more similar in nature to Dolezal's recent pattern of inattention to court requirements.

Dolezal was temporarily suspended from the practice of law in March 2010 for failing to respond to inquiry notices from the board relating to a complaint. However, we conclude the temporary suspension was adequate discipline for failing to respond to the board's inquiry, and will not consider his failure to respond to the board in fashioning any additional discipline. *Lickiss*, 786 N.W.2d at 870.

We also consider any mitigating circumstances. Since the late-1980s, Dolezal has undergone periodic counseling for depression stemming from his combat service in the Vietnam War. Dolezal participates in the counseling voluntarily and is currently taking three medications for depression and anxiety. While depression and other illnesses do not excuse an attorney's misconduct, they can be mitigating factors that influence our approach to discipline. *Carpenter*, 781 N.W.2d at 271. To the extent Dolezal acknowledges his depression and has sought appropriate treatment, we should take this into account in fashioning an appropriate sanction. *Fields*, 790 N.W.2d at 799–800.

Dolezal also testified that he underwent back surgery in September 2009 and was catheterized for three weeks.

Yet Dolezal's own testimony limits our ability to rely on these mitigating circumstances. In general, Dolezal did not attribute his specific ethical violations, as described above, to his medical conditions.[5] Rather, he essentially described his failure to take required court action in the Buresh, David, and Carter matters as decisions he made with full command of his faculties. Dolezal's attempts to justify his own conduct reveal some misunderstanding of ethical duties:

> A. . . . I believe my duty is to the client.
>
> Q. Do you believe you have a duty to the court, the courts in which you are licensed to practice, as well? A. I have – I see that as a secondary duty, yes. I have a duty to the court, but I believe my duty to the client exceeds or precedes my duty to the court.

*See Knopf*, 793 N.W.2d at 532 (refusing to consider personal illness as a mitigating factor when it was not shown to have affected the attorney's fitness to practice law).

In determining an appropriate sanction, we are guided not only by the factors listed above, but also by prior cases. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Conroy*, 795 N.W.2d 502, 506, (Iowa 2011). We find several prior neglect cases instructive to the present situation.

---

[5]For example, on the Buresh and David matters Dolezal testified:

> Q. Now, do you claim that problems with depression that you've had had anything to do with not getting the work done in the Buresh appeals? A. No.
>
> . . . .
>
> Q. And do you claim that your problems with depression had anything to do with the David matter, with not following through on the federal court case? A. Well, maybe not the following through . . . .

On the Carter matter, Dolezal claimed that he did not go back to court because he was "depressed" and "frustrated" about being owed several thousand dollars and the estate not having been resolved.

In *Conroy*, we found an attorney neglected two matters, did not comply with trust account requirements, failed to forward proceeds to a client, failed to furnish a timely and complete accounting regarding earned fees, failed to communicate with a client, and failed to respond to the board's inquiries and request for documents. *Id.* at 504–05. As mitigating circumstances, we found the attorney voluntarily ceased the practice of law and had no prior discipline. *Id.* at 506. Under these circumstances, we determined a sixty-day suspension was appropriate. *Id.* at 507.

Likewise, in *Thomas*, we found an attorney failed to serve original notice on a defendant in a personal injury action resulting in the case being dismissed. 794 N.W.2d at 292. The attorney compounded his neglect by avoiding his clients and then misrepresenting to his clients the cause of the dismissal. *Id.* Taking into account the attorney's history of prior disciplinary problems and several mitigating circumstances, we determined the attorney should be suspended from the practice of law for sixty days. *Id.* at 295.

In *Hoglan*, an attorney failed to prosecute four appeals resulting in their dismissal. 781 N.W.2d at 282–83. We decided the proper sanction was a suspension of thirty days, noting that each dismissal had harmed the client (although three of the clients did not hold this against Hoglan), the multiple incidents of neglect covered a two-and-a-half-year span, and the attorney had already been publicly reprimanded for the dismissal of two other appeals due to neglect. *Id.* at 286–87.

We do not believe this case warrants a sanction as severe as that in *Conroy* and *Thomas*. In *Conroy*, the attorney's neglect was coupled with two trust account violations that appear to be more serious than the trust account violation in this case. In *Thomas*, the attorney also made

misrepresentations to his clients, a factor we have not found here. Furthermore, while Dolezal's behavior has inconvenienced the court system, in two out of three instances it has not harmed his clients. We thus believe a sanction comparable to that in the *Hoglan* case is appropriate. As in *Hoglan,* we have a pattern of "dilatory handling" of litigated matters. *See* 781 N.W.2d at 287. Also, as in *Hoglan,* the attorney was recently involved with the board due to similar misconduct, although in this case Dolezal received a private admonishment, rather than a public reprimand. Although we have a trust account violation in this case, unlike in *Hoglan,* this consideration is counterbalanced to some extent by the fact that only one of Dolezal's acts of neglect caused harm to the client.

In our view, a public reprimand here would not be adequate. Such a sanction might have been appropriate had this case involved only a single instance of misconduct. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Sobel,* 779 N.W.2d 782, 789–90 (Iowa 2010) (attorney received public reprimand for failing to provide accounting for an advance fee payment); *Wright,* 758 N.W.2d at 231 (finding an attorney who failed to dismiss an appeal after his client was unable to raise enough funds warranted a public reprimand); *Piazza,* 756 N.W.2d at 700 (attorney received public reprimand for failing to place advance fee payment in trust account and to provide an accounting); *Tompkins,* 733 N.W.2d at 670 (finding an attorney who failed to dismiss appeal after he determined it to be without merit warranted a public reprimand); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Dunahoo,* 730 N.W.2d 202, 207–08 (Iowa 2007) (attorney was publicly reprimanded for failing to provide an accounting and neglect in timely closing an estate). The recurring pattern of conduct in this case warrants a stiffer sanction—namely, a suspension. *See*

*Marks*, 759 N.W.2d at 333 ("Although it is unlikely we would suspend Marks' license for these instances of neglect alone, Marks' pattern of refusing to cooperate with the Board's investigation tips the scale in favor of a short suspension."). Taking into account all the circumstances of this case, for the reasons we have already discussed, we agree with the commission's recommendation of a thirty-day suspension.

## IV. Conclusion.

Accordingly, we suspend Dolezal's license to practice law in the State of Iowa for thirty days. This suspension applies to all facets of the practice of law. *See* Iowa Ct. R. 35.12(3). Dolezal must comply with Iowa Court Rule 35.22 dealing with notification of clients and counsel. Costs of this action are taxed to Dolezal pursuant to Iowa Court Rule 35.26. Absent an objection by the board and under the condition that Dolezal has paid all costs assessed under rule 35.26, we shall reinstate Dolezal's license to practice law on the day after the thirty-day suspension period expires. *See* Iowa Ct. R. 35.12(2).

**LICENSE SUSPENDED.**