# IN THE SUPREME COURT OF IOWA

No. 15–1502

Filed November 10, 2016

**IOWA SUPREME COURT ATTORNEY DISCIPLINARY BOARD,**

Appellee,

vs.

**DAVID A. MORSE,**

Appellant.

On appeal from the report of the Grievance Commission of the Supreme Court of Iowa.

Attorney appeals from the findings of the grievance commission that he violated rules of the Iowa Rules of Professional Conduct and its recommendation that he receive a public reprimand. **LICENSE SUSPENDED.**

Michael J. Carroll of Coppola, McConville, Coppola, Carroll, Hockenberg & Scalise, P.C., West Des Moines, for appellant.

Tara van Brederode and Elizabeth Quinlan, Des Moines, for appellee.

**WATERMAN, Justice.**

This attorney disciplinary case arises from a lawyer's missteps that resulted in the dismissal of an appeal. His clients disputed the amounts their business owed to the plaintiffs in a mechanic's lien action and went to trial against his advice. The clients were disappointed in the trial outcome and chose to appeal but fell behind in paying his legal fees. The court reporter insisted on an advance payment of $1400 to prepare the trial transcript required for the appeal, and the clients tendered that amount to the lawyer. The lawyer failed to pay the court reporter. Seven weeks later, our court granted the appellees' motion to dismiss the appeal after extended deadlines to file the transcript were missed. The lawyer applied the $1400 against the fees his clients owed him, prompting the ethics complaint prosecuted by the Iowa Supreme Court Attorney Disciplinary Board. The Grievance Commission of the Supreme Court of Iowa found the attorney violated several disciplinary rules and recommended a public reprimand. On our de novo review, we conclude the attorney violated several rules and suspend his license to practice law for thirty days.

## I. Background Facts and Proceedings.

David Morse has practiced law since 1989. He works in Des Moines, primarily on debtor/creditor matters, bankruptcies, mechanic's liens, commercial litigation, family law, and criminal law. Morse also handles appeals. In early 2012, Morse took over cases of attorney Jerrold Wanek, who had died unexpectedly. This disciplinary complaint arises from Morse's representation of one of Wanek's former clients.

**A. The Stephenson Representation.** Dennis and Patricia (Patty) Stephenson own Stephenson Construction, LLC, which builds spec

homes in central Iowa. The Stephensons retained Wanek to attempt to settle debts with several subcontractors: Stenberg Concrete Construction; Ames Plumbing Services, Inc.; and Ames Heating & Cooling, Inc. Wanek obtained a settlement with Stenberg, but Wanek died before resolving the remaining disputes. Ames Plumbing filed a lien for $5937, and Ames Heating filed a lien for $7733. The Stephensons retained Morse in March 2012 to represent them when those creditors sought to foreclose these mechanic's liens on a spec home. Patty was Morse's primary contact because she kept the books.

The Stephensons paid Morse a $2500 retainer. Morse emailed the Stephensons a fee agreement that stated in part,

> Attorney may off-set any outstanding balance owed to Attorney under the terms of this contract. In addition, pursuant to Iowa Code § 602.10116, Attorney has certain lien rights for a general balance of compensation upon: . . . Money in the attorney's hands belonging to a client . . . .

Patty acknowledged receiving this fee agreement, but no signed copy is in the record.

Morse explored settlement with the creditors, but the Stephensons limited his settlement authority. The Stephensons argued they owed Ames Plumbing nothing but recognized they owed money to Ames Heating. Morse obtained an offer to settle with Ames Heating for $6150, but the Stephensons refused to pay more than $5000. Morse advised the Stephensons to settle with the lienholders because if they lost at trial they could be liable for the lienholders' attorney fees. The Stephensons chose to go to trial against his advice. Morse represented the Stephensons during the two-day bench trial in May. The Stephensons contested whether either lienholder had substantially performed its subcontract and presented evidence of their payments.

On July 6, the district court entered judgment against the Stephensons on both liens. The district court expressly found some of the Stephensons' testimony not credible. In its findings of fact, the district court found the Stephensons had not paid for any work done by Ames Plumbing and owed it $3192 plus $1500 for attorney fees, totaling $4692. Yet in an apparent math error or discrepancy, the court entered judgment in favor of Ames Plumbing for $6400 ($4900 for payment due on the contract and $1500 in attorney fees)—$1708 more than stated in the court's factual findings. The district court also found that Ames Heating had substantially performed its contract and that the Stephensons owed that entity the full amount of its mechanic's lien— $7733.63. The district court found Ames Heating's reasonable attorney fees were $5580 and entered judgment for $13,313.63.

Morse emailed a copy of the court's decision to the Stephensons within three days and asked them to contact him to "discuss what next steps can/should/ought to be taken." Patty promptly replied that she was upset with the ruling because she felt the judge had disregarded evidence that the Stephensons had paid $1900 to Ames Plumbing. She also noted that "[t]he pages don't say what the conclusion says." Morse reviewed the ruling with the Stephensons and discussed their options. He mentioned that they could file a motion to reconsider or appeal. The Stephensons decided to appeal. Morse explained that his retainer for the appeal would be $1750 and the Stephensons would be required to pay for the transcript, and the Stephensons agreed to pay both. The Stephensons also still owed Morse $2851 in fees for the trial. On July 23, Morse asked the Stephensons to get current with their overdue payments to him. Patty promised to pay half the outstanding bill the next week and the balance the week of August 11.

On August 3, Morse informed the Stephensons that he had filed the notice of appeal. His email indicated that he had received a partial payment and expected to be paid in full by August 11. On August 8, Morse filed the combined certificate and paid the $150 filing fee. The combined certificate incorrectly stated that "[f]inancial arrangements have been made with the reporter." Morse had not spoken with the court reporter, Pamela Hayes, who did not receive a copy of the combined certificate.

On August 30, Patty emailed Morse and explained the Stephensons had some unexpected expenses from equipment breakdowns, so they were unable to pay him. Patty promised to pay Morse the week of September 10. That did not happen. On December 5, the supreme court clerk issued a notice of failure to timely file transcript. The next day, Hayes filed an application for an extension of time, stating that she never received a copy of the combined certificate. Hayes wrote Morse and requested a $1400 deposit before beginning work on the transcript. Hayes stated she believed it would take up to forty days to complete the transcript. Morse emailed the Stephensons on December 6 to inform them that they owed the court reporter $1400 for the transcript. We granted Hayes's requested extension on December 11 and ordered the Stephensons to pay the court reporter within ten days.[1] On

---

[1]The December 11 order stated,

> This matter comes before the court upon court reporter Pamela Hayes's application for an extension of time to file transcripts. Upon consideration, the application is granted. Counsel for appellant shall ensure that court reporter Hayes is paid within 10 days of this order, and court reporter Hayes shall file the transcript within 50 days of this order.

Today, our orders are more detailed and state that the appeal will be dismissed if the court reporter is not timely paid. Below is text of a recent extension order:

> This matter comes before the court upon an application for extension of time to file the transcript filed by court reporter . . . , who

December 12, Morse sent the Stephensons a letter to inform them that he would not advance the cost of the transcript and asked them to send a check for $1400 payable to Pamela J. Hayes. On December 26, five days after our court-imposed payment deadline, Morse sent a follow-up letter with the same instructions. Patty responded by letter that day stating,

> I have tried to get to our bank to get a cashier check but we are working out of town & I never get there before they close. I am sending the $1,400 in check form[. I]t actually might be faster for the money for [the] clerk. Also a check for $500.00 to you and in 2 weeks I will send a large amount for you.

Patty emailed Morse on December 30 that she had sent a "1,400 dollar check for the court and 500 for you." She said she had been injured in a fall, they were working out of town, and she was unable to go to the bank when it was open. She hoped to catch up on the billing by the end of January or early February "if [her husband and she] stay[ed] healthy." She thanked Morse for working with them.

Morse received the checks on January 4, 2013. Both were payable to Morse. The memo line for the $500 check stated it was for "our bill" and the $1400 check was "for copies." Morse emailed Hayes accurately indicating that he had received the $1400 check from his clients and

---

reports that she is unable to file the ordered transcription because adequate payment arrangements have not been made.

The filing of a combined certificate is considered a professional statement by counsel that the transcript has been ordered in good faith and that no arrangements have been made or suggested to delay the preparation and that payment will be made in accordance with the rules. *See* Iowa R. App. P. 6.804(2). Therefore, within 10 days of this order, appellant shall pay court reporter . . . her required deposit. If payment is timely made, court reporter . . . shall have [forty days] to complete and file the transcript. If payment is not made by this deadline, court reporter . . . shall file a statement with this court indicating the same, and the appeal will be dismissed for failure to comply with the appellate rules.

inaccurately stating that it was in the mail to her. The same day, Morse emailed Patty noting the $1400 check was made out to him rather than to the court reporter and was deposited into his trust account instead of sent on to Hayes.

On January 8, Hayes filed a notice informing our court that she had not received the deposit Morse had promised to send. Hayes indicated that she would start working on the transcript as soon as she received the deposit and would keep the court informed of the status of the transcript. The next day, Morse's firm submitted a check request form to its bank for $1400 to be made out to Pamela Hayes for the transcript. That check inexplicably was not cut until January 31 and never was forwarded to Hayes.

Meanwhile, on January 10, Ames Heating moved to dismiss the appeal for failure to file a transcript. On January 14, the bank notified Morse that the Stephenson's $500 check had been returned for insufficient funds. Morse received no such notice as to the $1400 check and made no inquiry to determine whether it had cleared his bank. On January 18, Morse filed a resistance to motion to dismiss and motion to withdraw. In that filing, Morse explained that the Stephensons were required to pay for the costs of the appeal. Morse stated that the Stephensons had failed to pay the costs, despite their assurances that their payment obligations would be met. Morse acknowledged that he had received a check "intended to pay the $1400 transcript deposit." However, he stated that the $1400 check was payable to him, so he had deposited the check into his Interest on Lawyer Trust Accounts (IOLTA) account to ensure it cleared before he paid the reporter. His motion stated, "On 18 January 2013 the undersigned received notice that one or more of the checks received from Appellants on 4 January 2013 had

been returned [not sufficient funds]." He said that because of this, he was "currently still not in a position to tender the $1400 check to the Court Reporter for the advance deposit." Morse also requested "a reasonable extension of time to find replacement counsel to prosecute this appeal for [the Stephensons], to tender the sums necessary to obtain the transcript, and then file their page proof brief."

The same day, Morse emailed the Stephensons a copy of the filing. Morse stated that he was "awaiting word on whether or not the $1400 check that was supposed to be made out to the court reporter but which was made out to me instead bounced as well." He reminded them that he had been patient with them regarding their financial hardships, but he indicated that he would not be able to represent them going forward. Morse informed them that he could dismiss the appeal to avoid incurring additional costs and that they could consent to his withdrawal (or not) and also asked if the $500 check would clear. Patty replied on January 23 that she wanted Morse to pursue the appeal. Patty expressed confusion as to why the transcript was not being prepared because she said the "1400 dollars cleared back on the 7th of January."

On January 24, Ames Plumbing joined Ames Heating's motion to dismiss. The next day, Morse reminded Patty of the amounts owed, stating,

> I asked you to send me a check for $1400 made payable to the court reporter as she was requiring the downpayment to prepare the transcript—i.e. she types up the verbatim statements made during the trial—Instead you sent me two checks made payable me. One for $1400 and the other for $500. I had to deposit those into my trust account before sending a check to the court reporter and had to wait to see if they cleared. One did not. The other one apparently did. I notified you of the NSF check immediately upon receiving notice from my bank.

Patty responded on January 26 that the $500 check would clear if it was deposited after January 29, and she would send a cashier check for the balance of Morse's bill for his fees on February 4 and $2125 on February 11. Those promises were not kept.

On January 31, Morse's firm received from its bank the requested check for $1400 payable to Hayes but failed to send it on to her. On February 8, Morse received $1000 in a money order from the Stephensons. Morse accepted the money but sent a letter on February 12 informing them that he refused to proceed with the appeal.

On February 21, our court granted the appellees' motion to dismiss the appeal. Our order stated,

> The court reporter filed a notice on January 8th that she had yet to receive payment for the transcript. *The resistance filed by appellants' counsel indicates that counsel received a check from appellants on January 4th for the transcript deposit, but the check was returned for insufficient funds.* As of January 18th, the date the resistance was filed, it appears no payment has been made to the court reporter and no transcript is being prepared.

(Emphasis added.) Upon receipt of that order, Patty emailed Morse noting the $1400 check "was cashed from my bank on the fourth of January." She asked why the court had incorrect information and asked what happened with that money. Morse made no effort to reinstate the appeal or correct the record. On February 27, Morse told his partner to void the check for Hayes and to "apply the $1,400.00 towards the outstanding balance owed to our fees." Morse wrote the appellees the same day to inform them that the Stephensons wished to pay off their judgments.

On March 4, Patty emailed Morse to request return of their $1400 check intended for the court reporter. Morse replied on March 7 and refused to refund the $1400 before receiving payment for his fees. Morse

informed Patty that the $1400 was still in his trust account. He asserted the Stephensons owed him $1725. He stated that he would exercise his lien rights under Iowa Code section 602.10116(2) (2013), which states, "An attorney has a lien for a general balance of compensation upon . . . [m]oney in the attorney's hands belonging to a client." Morse stated that he would rely on that provision to apply the $1400 against their balance at the time of their next billing cycle. Patty replied the same day and characterized Morse's actions in holding the $1400 in the trust account as "holding the money for ransom." She wrote that she was angry because Morse previously had time to pay for the transcript to keep the appeal alive.

On March 8, Morse informed Patty that he had applied the $1400 to the Stephensons' outstanding balance for his fees. Patty emailed Morse five days later to express her "disagree[ment] with what [Morse] ha[d] done here because [applying the $1400 to their bill] was not the purpose for that money." She stated that she felt powerless to change the outcome.

On March 15, Patty called Morse and asked him to apply the $1400 against the Ames Plumbing judgment. He refused and reminded her that she still owed him $322 for his fees after the $1400 was applied. Morse, however, assisted Patty with the paperwork to satisfy the judgments. The next month, Dennis filed the ethics complaint resulting in this proceeding.

**B. Disciplinary Proceedings.** On December 18, 2014, the Board filed its complaint against Morse alleging that he violated Iowa Rules of Professional Conduct 32:1.3 (due diligence), 32:1.15(d) and (e) (safekeeping property), and 32:8.4(d) (conduct prejudicial to the administration of justice). On January 30, 2015, Morse filed his answer,

admitting most of the factual allegations. Morse, however, denied knowing the $1400 check had cleared the bank on January 7, 2013. He admitted that he had told the court reporter the check was on its way, but contended that at the time "he was of the impression that the $1400 check was made payable to the Court Reporter as requested" rather than to him. He denied violating any disciplinary rules.

The commission conducted an evidentiary hearing on May 8. On September 8, the commission filed its findings of fact, conclusions of law, and recommendations. The commission determined Morse's handling of the $1400 check violated rules of professional responsibility 32:1.3, 32:1.15(d) and (e), and 32:8.4(d). The commission recommended a public reprimand.

## II.  Scope of Review.

We review disciplinary proceedings de novo. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Weiland*, 862 N.W.2d 627, 634 (Iowa 2015). "The Board must prove attorney misconduct by a convincing preponderance of the evidence, a burden greater than a preponderance of the evidence but less than proof beyond a reasonable doubt." *Id.* at 634–35. "We give the commission's findings and recommendations respectful consideration, but we are not bound by them." *Id.* at 635.

## III.  Ethical Violations.

Morse's answer to the Board's complaint admitted most of the factual allegations. "Factual matters admitted by an attorney in an answer are deemed established, regardless of the evidence in the record." *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Silich*, 872 N.W.2d 181, 188 (Iowa 2015) (quoting *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Nelson*, 838 N.W.2d 528, 532 (Iowa 2013)). Morse denied that he knew or should have known the $1400 check for the transcript had cleared on January 7

and that the emails presented by the Board were complete and reflected his communications with the Stephensons. Morse denied that his conduct violated any ethical rules.

Upon our de novo review, we find Morse and his clients understood the $1400 check he received January 4, 2013, was to pay for the trial transcript. Morse never forwarded that payment to Hayes, despite receiving the $1400 check seven weeks before we dismissed the appeal for failure to file the transcript. He had ample time to verify the $1400 check had cleared. We conclude Morse violated all four disciplinary rules. Lawyers are not required to advance costs and may withdraw from a case on grounds of nonpayment subject to the provisions of rule 32:1.16. *See* Iowa R. Prof'l Conduct 32:1.16(b)(5), (c), (d). But Morse crossed the ethical line by pocketing his clients' $1400 payment intended for the court reporter—resulting in dismissal of the appeal his clients had chosen to file.

**A. Safekeeping Property.** The commission found that Morse violated two rules regarding safekeeping property. First, the commission found Morse violated rule 32:1.15(d), which states,

> Except as stated in this rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property.

*Id.* r. 32:1.15(d). This rule required Morse to forward the $1400 his clients paid for the transcript to Hayes, the court reporter.

Morse responds that his fee agreement takes his actions outside of this rule based on the phrase "[e]xcept as stated in this rule or otherwise permitted . . . by agreement with the client." *Id.* Morse claims the

following provision in his fee agreement justified claiming the $1400 for fees:

> Attorney may off-set any outstanding balance owed to Attorney under the terms of this contract. In addition, pursuant to Iowa Code § 602.10116, Attorney has certain lien rights for a general balance of compensation upon . . . Money in the attorney's hands belonging to a client . . . .

The problem for Morse is that his clients never agreed he could use the $1400 to pay his fees. To the contrary, Morse and the Stephensons understood that the $1400 was to pay for the transcript for their appeal. This understanding superseded the general lien provision in the fee agreement. *See Seneca Waste Sols., Inc. v. Sheaffer Mfg. Co.*, 791 N.W.2d 407, 412–13 (Iowa 2010) (discussing contract modification).

We addressed attorney liens in *Committee on Professional Ethics & Conduct v. Nadler*, 445 N.W.2d 358, 361 (Iowa 1989). Nadler negotiated a settlement on his client's behalf with a credit union to avoid the repossession of the client's vehicle. *Id.* His client gave him the money for the settlement but was unable to pay Nadler's attorney fees. *Id.* Nadler retained the settlement funds, claiming an attorney's lien under Iowa Code section 602.10116. *Id.* The commission found Nadler's retention of the settlement fund "breached his ethical duty to honor his contract of employment with [his client], and to take no action that would prejudice or otherwise impede the lawful objectives of his client." *Id.* We agreed. *Id.* We noted "it is unthinkable that a lawyer would satisfy a fee bill out of funds entrusted by a client for the express purpose of settling a lawsuit." *Id.* We adopted the general rule that "[p]roperty or funds delivered for a special purpose by a client to his attorney cannot constitute the subject matter of a retaining lien in favor of such attorney." *Id.* (alteration in original) (quoting 7A C.J.S. *Attorney & Client*

§ 377, at 745 (1980)). "[A]n attorney cannot allow a fee claim to conflict with the lawyer's obligation as a trustee . . . ." *Id.* *Nadler* is instructive here.

The Stephensons sent Morse the $1400 payment for a special purpose—to pay for the trial transcript needed for their appeal. Morse failed to forward the money to the court reporter for seven weeks before the case was dismissed. This violated the Stephensons' reasonable expectations that their $1400 payment would go to the court reporter. We agree with the commission and Board that Morse violated rule 32:1.15(d) by failing to promptly forward the funds to Hayes. Morse's inaction resulted in dismissal of the appeal and thereby thwarted the special purpose for which the funds were tendered. We decline to reward his misconduct by allowing him to assert his lien against funds tendered for a special purpose he thwarted.

The Board relies on *State ex rel. Oklahoma Bar Association v. Cummings*, 863 P.2d 1164 (Okla. 1993). In *Cummings*, the client advanced $500 for the cost of a deposition that was later canceled. *Id.* at 1166–67. The lawyer argued the special purpose no longer existed and asserted her lien rights to collect that money for her fees. *Id.* at 1170. The Oklahoma Supreme Court rejected her lien claim, stating,

> It matters not that the "special purpose" comes to an end while the funds are in a lawyer's hands. It is enough that the money was *originally designated* for a "specific purpose[."] When entrusted with money for a specific purpose a lawyer must not allow his claimed fee for services rendered to conflict with his duties as a fiduciary.

*Id.* at 1170–71.

> A contrary rule would invite lax behavior by lawyers holding property or monies designated for a specific purpose. A lawyer could intentionally schedule a deposition, take the client's expense money, cancel the deposition and then claim

> that because the purpose no longer exists, he is entitled to the funds. The return of expense funds should not be affected by some extraneous event, such as the dismissal of a lawsuit. A lawyer's fiduciary obligation continues until the property has either been returned to the client or an agreement reached for its disposition.

*Id.* at 1171 n.32. We agree with this reasoning. We favorably cited an analogous decision in *Nadler.* 445 N.W.2d at 361 (citing *Fla. Bar v. Bratton,* 413 So. 2d 754, 755 (Fla. 1982) (per curiam)). In *Bratton,* the client provided funds for a bond in a foreclosure proceeding. 413 So. 2d at 754. When the bond was released, the lawyer asserted his lien against the funds. *Id.* The Florida Supreme Court held the funds entrusted to the lawyer for a special purpose were not subject to the attorney lien and should have been returned to the client even after that purpose ended, regardless of any claim for past due fees. *Id.* at 755. Similarly, under this precedent, Morse could not assert his attorney lien against the $1400 even after the special purpose for which it was paid no longer existed. We therefore hold that the dismissal of the appeal through Morse's inaction did not permit him to claim a lien against the $1400 his clients had tendered to pay for the transcript.

Second, the commission found Morse violated rule 32:1.15(e), which requires a lawyer "in possession of property in which two or more persons (one of whom may be the lawyer) claim interests" to keep the property separate "until the dispute is resolved." Iowa R. Prof'l Conduct 32:1.15(e). When there is a disagreement over who gets the money, "the lawyer must keep 'the disputed portion of the funds . . . in a trust account and the lawyer should suggest means for prompt resolution of the dispute, such as arbitration.'" *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Rhinehart,* 827 N.W.2d 169, 181–82 (Iowa 2013) (quoting Iowa R. Prof'l Conduct 32:1.15 cmt. 3). Morse and his clients disagreed over

disposition of the $1400 intended to pay for the transcript. After learning their appeal had been dismissed, the Stephensons instructed Morse to return the $1400 or pay the judgment creditor. They objected to his applying that sum against the fees they owed after his failure to pay Hayes caused the dismissal of their appeal. This pending dispute precluded him from simply applying the $1400 against his overdue fees over his clients' objection.

*Rhinehart* is instructive. Richard Rhinehart represented homeowners in a construction-defect lawsuit against a general contractor, an insurance company, and roofing subcontractor. *Id.* at 174. Rhinehart initially was hired at an hourly rate but later agreed to proceed on a contingent-fee basis with the amount he already collected for hourly charges to be deducted from his percentage. *Id.* His clients rejected a $400,000 settlement offer and proceeded to trial against Rhinehart's advice. *Id.* The jury awarded his clients only $33,280. *Id.* The controlling fee agreement mandated that the one-third contingency fee—$11,082—was to be reduced by $10,633 in hourly fees paid previously. *Id.* at 174–75. Rhinehart nonetheless retained the entire $11,082, blaming his clients' intransigence. *Id.* at 175. Rhinehart's clients objected. *Id.* Rhinehart returned the disputed fees over three years later. *Id.*

We concluded "Rhinehart violated this rule in every respect." *Id.* at 182. "In the face of this dispute, rather than keeping the fees in a separate account until the dispute was resolved as is required under the rule, Rhinehart paid the fees out to himself." *Id.* We rejected Rhinehart's assertion that his clients' refusal to discuss the issue entitled Rhinehart to collect the fee. *Id.* Rhinehart failed to make any effort to resolve the dispute. *Id.*

Similarly, Morse's emails acknowledge that his clients disputed how the $1400 should be applied, but he unilaterally chose to pay himself. He argues there was no true "dispute" because his fee agreement stated that he was entitled to apply a client's money towards his outstanding balance. We disagree. Morse was obligated under rule 32:1.15(e) to keep the funds in his trust account pending resolution of the dispute. He instead acted as judge and jury to resolve the dispute in his own favor. We determine Morse violated rule 32:1.15(e).

**B. Due Diligence.** Rule 32:1.3 states, "A lawyer shall act with reasonable diligence and promptness in representing a client." Iowa R. Prof'l Conduct 32:1.3. This rule sanctions neglect. *Silich*, 872 N.W.2d at 188–89. "A violation of this rule arises not from inadvertent acts or omissions or from missing a single deadline, but from consistently failing to perform functions required of an attorney or from repeatedly missing deadlines." *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Conroy*, 845 N.W.2d 59, 64 (Iowa 2014). A lawyer violates this rule when he or she consistently fails to perform the obligations that the lawyer has assumed or consciously disregards the responsibilities the lawyer owes to the client. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Van Ginkel*, 809 N.W.2d 96, 102 (Iowa 2012).

Morse did not inadvertently miss a deadline. Rather, he chose a course of action contrary to his obligation of diligence. He received two specific warnings from our court: the default notice and the order extending the deadline to file the transcript. His clients then tendered the $1400 advance payment for the transcript required by the court reporter. Morse intentionally withheld those funds from the court reporter for another seven weeks—well past the court-imposed

deadline—resulting in our subsequent order dismissing the appeal. The commission found Morse's conduct violated rule 32:1.3. We agree.

Morse relies on our precedent holding a lawyer who failed to pay for a transcript did not commit neglect in violation of our former Iowa Code of Professional Conduct for Lawyers DR 6—101(A)(3). *See Van Ginkel,* 809 N.W.2d at 102 ("[W]e have typically cited cases under DR 6-101(A)(3) as precedent for the interpretation and application of rule 32:1.3 . . . ."). In *Iowa Supreme Court Attorney Disciplinary Board v. Wright,* Robert Wright represented Samantha Brown in an appeal of a child custody dispute. 758 N.W.2d 227, 228 (Iowa 2008). Brown had failed to pay for Wright's services in the district court. *Id.* Wright contacted the court reporter to get an estimate of the cost to prepare the trial transcript. *Id.* The court reporter required prepayment before she would prepare the transcript. *Id.* Brown said she would attempt to borrow the money. *Id.* at 228–29. Wright prepared and filed a combined certificate. *Id.* at 229. The combined certificate contained a professional statement that "payment for the transcript will be made." *Id.* The court reporter never received the combined certificate or payment, so the clerk of our court notified Wright that the appeal would be dismissed for want of prosecution if the default was not cured within fifteen days. *Id.* Brown told Wright that she could not pay, but she would continue to save up the money. *Id.* Wright remained in contact with Brown, but he never paid for the transcript, and the appeal was dismissed. *Id.*

We found that Wright did not neglect Brown's interests by failing to pay for the transcript. *Id.* at 230. Wright's course of conduct was intended to promote his client's interests:

> Wright spoke with Brown on several occasions after filing the combined certificate, monitoring whether she had raised the funds to pay for the transcript. He wanted to proceed with

his client's appeal, but was unwilling and not contractually obligated to advance the cost of the transcript. Brown attested in an affidavit it was her failure to pay for the transcript, not Wright's actions, that prevented her from proceeding with the appeal. . . . Wright in fact protected Brown's interest by commencing and maintaining the appeal notwithstanding her failure to pay his fee as she had agreed, and by allowing her time . . . to raise the funds to pay for the transcript.

*Id.*[2]

We similarly found no violation of the rule requiring diligence in *Weiland*, 862 N.W.2d at 636. Kenneth Weiland represented a client who was unable to pay for the funds for the appellate filing fee or transcript. *Id.* at 634. Weiland advanced the filing fee but asked his client to pay for the transcript. *Id.* His client never paid for the transcript, and the appeal was dismissed for failure to comply with the appellate rules. *Id.* at 632. Weiland testified that he did not dismiss the appeal before the deadline because he hoped his client would come up with the money. *Id.* at 634. We held Weiland's conduct did not constitute neglect because "Weiland attempted to protect the interests of his client by commencing and maintaining the appeal, advancing [his client] funds for the filing fee, and allowing [his client] time to raise funds for the transcript." *Id.* at 636.[3]

*Wright* and *Weiland* are distinguishable because the Stephensons sent Morse a $1400 check specifically to pay for the transcript. He received that check seven weeks before the appeal was dismissed for failure to file the transcript. Morse understood that check was intended

---

[2]We nevertheless found Wright's failure to affirmatively dismiss the appeal constituted conduct prejudicial to the administration of justice in violation of DR 1–102(A)(5). *Wright*, 758 N.W.2d at 231.

[3]We found Weiland's conduct violated rule 32:3.2 requiring reasonable efforts to expedite litigation consistent with the client's interests and constituted conduct prejudicial to the administration of justice in violation of rule 32:8.4(d). *Weiland*, 862 N.W.2d at 637–38.

to pay the court reporter. Morse had sufficient time to verify the check had cleared and funds were available to pay the court reporter. His seven-week long failure to arrange payment for the transcript caused the administrative dismissal of the appeal his clients had chosen to file. In that respect, Morse "conscious[ly] . . . disregard[ed] the responsibilities [he] ow[ed] to a client." *Van Ginkel*, 809 N.W.2d at 102. We agree with the commission's finding that Morse violated rule 32:1.3.

**C. Conduct Prejudicial to the Administration of Justice.** The commission found Morse violated rule 32:8.4(d), which states, "It is professional misconduct for a lawyer to . . . engage in conduct that is prejudicial to the administration of justice." Iowa R. Prof'l Conduct 32:8.4(d). "[A]n attorney representing a client violates rule 32:8.4(d) when his misconduct results in additional court proceedings or causes court proceedings to be delayed or dismissed." *Rhinehart*, 827 N.W.2d at 180. In *Weiland*, we held that "[w]hen an attorney's failure to comply with appellate deadlines results in an administrative dismissal, his actions are prejudicial to the administration of justice." 862 N.W.2d at 638 (quoting *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Dolezal*, 796 N.W.2d 910, 914 (Iowa 2011)). We reiterated that "[o]ur case law makes it clear that an attorney cannot use a default notice to dismiss an appeal in lieu of the attorney's obligation to comply with our appellate rules." *Id.* (quoting *Wright*, 758 N.W.2d at 231).

Unlike the attorneys in *Wright* and *Weiland*, Morse filed a motion to withdraw that sought additional time for his clients to obtain substitute counsel and pay for the transcript. But if Morse had simply paid the $1400 to Hayes to prepare the transcript when the check cleared in early January, the administrative dismissal would have been avoided. Instead, his filing in mid-January led the clerk to believe the

lack of a transcript was attributable to the Stephensons' nonpayment. That was the reason given for the administrative dismissal a month later. Morse did nothing to correct the record or reinstate the appeal. We agree with the commission that Morse violated rule 32:8.4(d).

**IV. Sanction.**

Morse violated four disciplinary rules by committing misconduct that resulted in dismissal of an appeal his clients had chosen to pursue. The commission recommends we publicly reprimand Morse. We give the commission's recommendation respectful consideration, but may impose a greater or lesser sanction. *Id.* at 635. We consider several factors, including

> the nature of the violations, the attorney's fitness to continue in the practice of law, the protection of society from those unfit to practice law, the need to uphold public confidence in the justice system, deterrence, maintenance of the reputation of the bar as a whole, and any aggravating or mitigating circumstances.

*Silich*, 872 N.W.2d at 192 (quoting *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Clarity*, 838 N.W.2d 648, 660 (Iowa 2013)).

Morse, denying any ethical violation, seeks dismissal of the charges against him. The Board did not recommend a specific sanction in its appellate brief but asked us to consider the harm to Morse's client, his failure to admit the wrongfulness of his conduct, his prior disciplinary record, his experience, and the multiple rule violations as aggravating factors. At oral argument, the Board urged that a suspension would be an appropriate sanction.[4]

---

[4]The Board never sought revocation and never charged Morse with misappropriating or converting client or third-party funds for personal use without a colorable future claim. *See* Iowa Ct. R. 36.8. Accordingly, revocation is not warranted legally or factually.

Morse's twenty-six years of experience in debtor/creditor work, including appeals, is an aggravating factor. *See Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Wagner*, 599 N.W.2d 721, 730 (Iowa 1999) ("Sixteen years in the practice with a heavy emphasis in real estate transactions tell us that Wagner should have known better.").

Prior discipline can be an aggravating factor. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Said*, 869 N.W.2d 185, 194 (Iowa 2015) (considering a prior private admonition for similar conduct). Morse has received three private reprimands during his twenty-six years of practicing law. He was privately admonished in 1999 for overcharging a client for a transcript. In 2006, he was privately admonished for failing to file a lawsuit within the statute of limitations after the client reneged on payment obligations. In 2002, Morse received a private admonition based on his failure to comply with appellate deadlines that resulted in dismissal of an appeal for want of prosecution. That admonition is an aggravating factor here because it reminded Morse that failing to follow court deadlines to prosecute a client's appeal violates our disciplinary rules. Although " '[p]rivate reprimands are not discipline,' they provide notice of deficiencies in regards to particular ethical requirements by attorneys." *Said*, 869 N.W.2d at 194 (alteration in original) (quoting *Van Ginkel*, 809 N.W.2d at 110); *see also Iowa Supreme Ct. Att'y Disciplinary Bd. v. Parrish*, 801 N.W.2d 580, 589 (Iowa 2011) (collecting cases considering prior admonitions as an aggravating factor).

Client harm is an aggravating factor, but we discern only minimal client harm here—the lost opportunity to proceed with the appeal. Morse testified he believed the appeal had merit. That is true as to the district court's math error of $1708. The Board made no showing the appeal could obtain greater relief. No legal error was identified in the district

court's ruling, and the court's factual findings made in the bench trial are binding on appeal when supported by substantial evidence. Iowa R. App. P. 6.904(3)(*a*). The district court made credibility findings adverse to the Stephensons and was entitled to believe the testimony of the lienholders to support the amounts awarded. Losing the appeal on the merits would expose the Stephensons to additional liability for the lienholders' appellate attorney fees and costs. Dismissal of the appeal avoided further attorney fees and saved the $1400 cost of the transcript. The Stephensons admittedly owed Morse more than that amount in past due fees and thereby benefited by that sum when it was used to pay down what they owed him. Morse was entitled to withdraw for nonpayment of his remaining fees, and given the Stephensons' payment history, we are skeptical they would have secured new counsel without a retainer. The commission understandably made no finding of client harm when it recommended a public reprimand.

We next discuss mitigating factors. Morse cooperated with the Board. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. McGinness*, 844 N.W.2d 456, 467 (Iowa 2014) (noting that cooperating with the disciplinary board can be a mitigating factor). Morse's long history of volunteer service is another mitigating factor. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Schall*, 814 N.W.2d 210, 215 (Iowa 2012) (noting community service as a mitigating factor). Morse grades bar exams every year, and he takes bankruptcy cases from the Volunteer Lawyers Project annually. He regularly volunteers at a booth that gives free legal advice for Alcoholics Anonymous and Narcotics Anonymous participants on debtor/creditor or landlord/tenant issues. Morse is also the president of the Family Promise of Greater Des Moines homeless shelter.

We next consider our precedent to determine the appropriate sanction. "We strive to maintain consistency with our prior cases." *Silich*, 872 N.W.2d at 192. Regarding the due-diligence violation, our cases have imposed sanctions ranging from a public reprimand to a six-month suspension. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Lemanski*, 841 N.W.2d 131, 134 (Iowa 2013) (collecting cases). "[N]eglect compounded with other misconduct generally moves the sanction towards the higher range." *Id.*

We have publicly reprimanded counsel whose misconduct fell short of neglect or lack of diligence but was nevertheless prejudicial to the administration of justice when the lack of a transcript led to the administrative dismissal of the appeal. *Weiland*, 862 N.W.2d at 643;[5] *Wright*, 758 N.W.2d at 231. In *Iowa Supreme Court Attorney Disciplinary Board v. Tompkins*, we imposed a public reprimand when the attorney allowed an appeal to be administratively dismissed and neglected a different client's case. 733 N.W.2d 661, 667–68, 670 (Iowa 2007).

When neglect results in the dismissal of multiple appeals, we generally impose a harsher sanction. In *Iowa Supreme Court Attorney Disciplinary Board v. Hoglan*, we suspended an attorney's license for thirty days for failing to prosecute four appeals, which led to their administrative dismissal. 781 N.W.2d 279, 282–83, 287 (Iowa 2010). The attorney had recently been publicly reprimanded for similar conduct. *Id.* at 286–87. We imposed the same sanction in *Dolezal*, noting the attorney permitted two appeals to be administratively dismissed. 796

---

[5]One justice dissented, concluding that Weiland's prior disciplinary record and forty prior delinquency notices from the supreme court clerk warranted a thirty-day suspension. *Weiland*, 862 N.W.2d at 643 (Wiggins, J., dissenting).

N.W.2d at 922–23. That case also involved the neglect of two other client matters and trust account violations. *Id.* at 920.

Our rules for safekeeping property overlap with trust account violations.

> Sanctions for trust account and accounting violations span from "a public reprimand when the attorney, in an isolated instance, failed to deposit funds into his trust account because he believed the fees to be earned" to "suspensions of several months where the violations were compounded by severe neglect, misrepresentation, or failure to cooperate."

*Iowa Supreme Ct. Att'y Disciplinary Bd. v. Cross*, 861 N.W.2d 211, 225 (Iowa 2015) (quoting *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Boles*, 808 N.W.2d 431, 442 (Iowa 2012)). In *Nadler*, we suspended an attorney for a year for disciplinary violations involving his wrongful assertion of an attorney lien on funds the client tendered to pay a third-party debt, but that suspension was also based on other violations, including a criminal conviction for assault, neglect in four probate matters, and failure to cooperate with the disciplinary authorities. 445 N.W.2d at 362.

We have imposed suspensions when the trust account violations are coupled with other violations. In *Iowa Supreme Court Attorney Disciplinary Board v. Vilmont*, our court imposed a thirty-day suspension for an attorney who charged and collected an unreasonable fee and failed to provide a timely accounting when he withdrew the fee. 812 N.W.2d 677, 679–80 (Iowa 2012). We focused on his "unethical minimum-fee arrangement" to conclude a suspension was appropriate instead of a public reprimand. *Id.* at 680. That is somewhat analogous to Morse's misuse of the lien provision in his fee agreement to pocket funds his clients entrusted to him to pay the court reporter for the transcript required for their appeal.

We consider whether the attorney has a colorable claim to the fees. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Casey*, 761 N.W.2d 53, 62 (Iowa 2009). For example, in *Casey*, an attorney prematurely withdrew a probate fee and failed to deposit the fee into the trust account, among numerous other violations involving neglect and misrepresentation. *Id.* We noted that the attorney "had a colorable claim to these fees, once the estate was closed." *Id.* We determined that the premature payment did not require the harshest sanction in light of his colorable claim to the funds. *Id.* Here, Morse clearly had a colorable present claim to the $1400—he was owed more than that in past-due legal fees.

In *Iowa Supreme Court Attorney Disciplinary Board v. Ries*, the attorney represented a client in a marital dissolution. 812 N.W.2d 594, 595 (Iowa 2012). After the divorce was finalized, the client overpaid his attorney fees by $500. *Id.* Ries failed to refund the overpayment for more than a year due to his own financial difficulties. *Id.* at 596. We characterized the situation as "the somewhat unique circumstances of an attorney being accidentally overpaid for the services already rendered." *Id.* at 597. In crafting a sanction, we noted the isolated nature of the misconduct, the lack of misrepresentation or dishonesty, and the lack of significant other ethical lapses. *Id.* at 598. However, we noted that the attorney was not entitled to the money. *Id.* We held that a thirty-day suspension was appropriate. *Id.* at 599; *see also Boles*, 808 N.W.2d at 442–43 (imposing thirty-day suspension for misconduct involving four clients, including failing to return unearned legal fees and improperly retaining disputed property).

On balance, we conclude a thirty-day suspension is appropriate here to discourage lawyers from misdirecting funds entrusted to them for a special purpose.

**V. Disposition.**

We suspend Morse's license to practice law with no possibility of reinstatement for thirty days from the filing of this opinion. This suspension applies to all facets of the practice of law. *See* Iowa Ct. R. 34.23(3). Morse must comply with the notification requirements of Iowa Court Rule 34.24. Costs of this action are taxed to Morse pursuant to Iowa Court Rule 36.24. Unless the Board objects, Morse's disciplinary suspension shall automatically terminate after the thirty days on the condition that he has paid the costs of this action. *See id.* r. 34.23(2).

**LICENSE SUSPENDED.**

All justices concur except Zager and Hecht, JJ., who concur specially, and Wiggins, J., who concurs in part and dissents in part.

#15–1502, *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Morse*

**ZAGER, Justice (concurring specially).**

I agree with the majority's conclusion that Morse violated the Iowa Rules of Professional Conduct and with the sanction imposed. As noted by the majority, the Iowa Supreme Court Attorney Disciplinary Board never alleged a misappropriation or conversion of client or third-party funds for personal use without a colorable future claim.[6]

We have repeatedly held that it is imperative to the integrity of our disciplinary proceedings that adequate notice of the charges must be provided to an attorney, and the failure to do so is a violation of due process. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Stoller*, 879 N.W.2d 199, 222 (Iowa 2016); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Att'y Doe No. 792*, 878 N.W.2d 189, 201 (Iowa 2016); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Cepican*, 861 N.W.2d 841, 844 (Iowa 2015); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Cross*, 861 N.W.2d 211, 219 n.3 (Iowa 2015); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Kelsen*, 855 N.W.2d 175, 183 n.3 (Iowa 2014); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Nelson*, 838 N.W.2d 528, 536 n.2 (Iowa 2013); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Rickabaugh*, 728 N.W.2d 375, 379 n.3 (Iowa 2007). In these cases, we have repeatedly declined to hear issues not charged by the Board.

In this case, Morse was not charged with misappropriation or conversion of client funds, nor was the hearing before the Grievance

---

[6]Iowa Court Rule 36.8(1) provides,

If the complainant intends to assert that a respondent misappropriated or converted client or third-party funds in violation of rule 32:1.15 or chapter 45 of the Iowa Court Rules, the complainant must specifically allege in its complaint the misappropriation or conversion for personal use without a colorable future claim.

Iowa Ct. R. 36.8

Commission of the Supreme Court of Iowa conducted on this basis. Morse was given no notice that the commission would consider such a charge against him during his disciplinary proceedings. "[The] absence of fair notice as to the reach of the grievance procedure and the precise nature of the charges deprived petitioner of procedural due process." *In re Ruffalo*, 390 U.S. 544, 551, 88 S. Ct. 1222, 1226, 20 L. Ed. 2d 117, 123 (1968). In the absence of proper notice, the disciplinary proceedings "become a trap when, after they are underway, the charges are amended." *Id.* at 552, 88 S. Ct. at 1226, 20 L. Ed. 2d at 122. While Morse may have committed ethical violations other than those charged, "it is incumbent on the Board to properly raise the alleged violations in order to provide proper notice of the charges to the attorney. It must then prove the violation by a clear preponderance of the evidence." *Attorney Doe No. 792*, 878 N.W.2d at 201. For this reason, I agree that revocation was not an appropriate sanction for our consideration.

I write separately to express my general agreement that it may be time to reevaluate our approach to cases involving misappropriation and conversion of funds as advocated by Justice Wiggins in his dissent. However, this can only be done when there is a properly charged and litigated case of alleged lawyer misappropriation or conversion of client or third-party funds. The dichotomy of legal versus illegal stealing has long troubled some members of the court and the bar. But this is not the case where such a sea change in our disciplinary analysis should occur. As with any dramatic change, we prefer to take a thoughtful and incremental approach after a full development of the facts, arguments, and law are completed. *See, e.g., Miranda v. Said*, 836 N.W.2d 8, 17–22 (Iowa 2013) (discussing the gradual-change approach to developing contract and tort law). Another approach that could be considered is

rulemaking where all interested parties may give input into what standards and analysis of discipline for lawyers should apply. These approaches provide fairness and justice to the Board and the lawyers in this state. I think it is time to begin this discussion.

Hecht, J., joins this special concurrence.

#15–1502, *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Morse*

**WIGGINS, Justice (concurring in part and dissenting in part).**

I agree with the majority's conclusion that Morse violated the Iowa Rules of Professional Conduct. However, I cannot agree with the way the majority reached a sanction nor the result.

In the past, our court has determined a sanction when an attorney has misappropriated client's funds by distinguishing between what I label "legal stealing" and "illegal stealing." "Legal stealing" allows an attorney to receive a lesser sanction when the attorney misappropriates a client's funds so long as the attorney has a colorable future claim to the funds misappropriated. *See, e.g., Iowa Supreme Ct. Att'y Disciplinary Bd. v. Lubinus*, 869 N.W.2d 546, 552 (Iowa 2015). However, if an attorney commits "illegal stealing" and misappropriates funds without a colorable future claim to the funds, we revoke that attorney's license. *Id.*

I believed the court developed this distinction because revocations of an attorney's license were ordinarily permanent. *See Comm. on Prof'l Ethics & Conduct v. Brodsky*, 487 N.W.2d 674, 675 (Iowa 1992). This distinction has never made sense to me, but I went along with it because of the harshness of the sanction of revocation. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. McCann*, 712 N.W.2d 89, 97 (Iowa 2006). The time has come to drop the distinction between legal and illegal stealing when sanctioning an attorney for misappropriating client funds. I reach this conclusion for a number of reasons.

First, the distinction between legal and illegal stealing is absurd. A person who knowingly converts the property of another does not have the character traits we want in a lawyer serving our citizens. Furthermore, the criminal law of this state does not make such a distinction for that very reason. If an independent contractor took money or property from

his or her employer without the employer's permission and at the end of the relationship reduced the bill, the fact that the independent contractor had a colorable *future* claim to the funds would not be a defense to a charge of theft. The legislature codified the claim-of-right defense. It provides,

> No person who takes, obtains, disposes of, or otherwise uses or acquires property, is guilty of theft by reason of such act if the person reasonably believes that the person has a right, privilege or license to do so, or if the person does in fact have such right, privilege or license.

Iowa Code § 714.4 (2015). By its terms, at the time the person takes, obtains, disposes of, or otherwise uses or acquires property, the person must believe he or she has a right to do so at the time the person takes, obtains, disposes of, or otherwise uses or acquires property, not just a colorable future claim to the property. Moreover, Iowa Rule of Professional Conduct 32:1.15 does not contain a claim of right or colorable future claim allowing an attorney to take funds. The clear import of rule 32:1.15 is that property, including money, given to an attorney is to be safeguarded by the attorney, to be used by the attorney for the purpose for which it was given, and only earned by the attorney after the attorney did the work to earn the fee. As the majority found, and I agree, Morse misappropriated funds given to him for a transcript by using the funds for his fee.

Second, the application of the legal and illegal stealing dichotomy undermines the purpose of rule 32:1.15. As an Iowa Law Review note writer recently articulated,

> Iowa's approach fails to effectuate the intent of the ABA. Because the Iowa Supreme Court overvalues flexibility and a particularized approach, the ABA values of uniformity and consistency are lost. While exceptions to Iowa's misappropriation rule, like the colorable-future-claim

defense and the ambiguous definition of misappropriation, allow the court to tailor sanctions to each case's specific facts, these factors also lead to inconsistency in sanctions. As noted by the ABA, wide variance and inconsistency in sanctions, such as the sanctions imposed by the Iowa Supreme Court, may cause the public as well as those within the profession to "doubt . . . the efficiency and the basic fairness" of the disciplinary system.

The Iowa Supreme Court must delve deep into the factual intricacies of every case that comes before it. With this approach, Iowa strives for "consistency in discipline cases by considering its treatment of lawyers in 'similar' cases." However, while it is true that the ABA values flexibility and a particularized approach may promote fairness, the extent of flexibility in Iowa's approach may have the opposite effect. Case-by-case approaches like Iowa's

> are often unsuccessful because the court[] disregard[s] seemingly similar cases, or cannot agree upon the factors that should be considered when assessing similarity, or do[es] not consider the same factors important from case to case. As a result, the quest for "similarity" is chimerical because it is often possible to find both similarities to and distinctions from earlier decisions, giving [the] court[] significant latitude to show that any case is "similar to" or "different from" previous cases.

The result is a sense of arbitrariness, not evenhandedness. The widely varied case law in Iowa regarding sanctions for "seemingly similar" safekeeping violations demonstrates the failure of this approach.

Allison A. Schmidt, *The Old Man and Rule 8.4(c): A Proposal for the Adoption of Maryland's Misappropriation Rule in Iowa*, 101 Iowa L. Rev. 465, 491–92 (2015) (footnotes omitted) (first quoting Standards for Imposing Lawyer Sanctions pt. I.A (Am. Bar Ass'n 1992); then quoting Leslie C. Levin, *The Emperor's Clothes and Other Tales About the Standards for Imposing Lawyer Discipline Sanctions*, 48 Am. U.L. Rev. 1, 35, 36–37 (1998)). I wholeheartedly agree with this assessment.

Third, the rules governing the reinstatement of revoked attorneys have changed. We recently adopted Iowa Court Rule 34.25 allowing revoked attorneys to reapply for reinstatement. In applying this new rule, we have provisionally reinstated a revoked attorney. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Reilly*, 884 N.W.2d 761, 762 (Iowa 2016) (per curiam).[7] These changes make it easier for me to revoke the license of an attorney who misappropriates funds from a client with a colorable future claim to those funds.

Finally, sanctions in this area have been disproportionately lower than sanctions for other actions. For example, in *Iowa Supreme Court Attorney Disciplinary Bd. v. Taylor*, ____ N.W.2d ____, ____ (Iowa 2016), we suspended the license of an attorney for six months when she failed to file her tax returns for ten years. Incredibly, some members of the *Morse* majority here in *Taylor* urged a one-year suspension. *Id.* at ___ (Waterman, J., dissenting). In *Taylor*, the attorney caused no harm to a client. Nevertheless, here, where the attorney converts his clients' funds and causes harm to those clients, the attorney gets a shorter suspension.

Accordingly, I would not use the distinction between legal and illegal stealing to determine the proper sanction. Rather, I would apply the objective criteria of the ABA's *Standards for Imposing Lawyer*

---

[7]It is interesting to note, in the case revoking Reilly's license the commission recommended a suspension of three years. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Reilly*, 708 N.W.2d 82, 82 (Iowa 2006). There, Reilly caused no harm to his client, but avoided harming his client by perpetrating a check-kiting scheme to pay his client the money he misappropriated. *Id.* at 82, 85. In spite of the commission's recommendation, we revoked his license. *Id.* at 85. Had we applied the ABA's *Standards for Imposing Lawyer Sanctions* (1992), we would have probably followed the commission's recommendations.

*Sanctions* (1992). At least twenty-eight states have used the American Bar Association's standards when imposing discipline.[8]

In situations involving an attorney's failure to preserve a client's property, the standards provide,

4.1 Failure to Preserve the Client's Property

Absent aggravating or mitigating circumstances, upon application of the factors set out in 3.0, the following sanctions are generally appropriate in cases involving the failure to preserve client property:

4.11 Disbarment is generally appropriate when a lawyer knowingly converts client property and causes injury or potential injury to a client.

4.12 Suspension is generally appropriate when a lawyer knows or should know that he is dealing improperly with client property and causes injury or potential injury to a client.

---

[8]*In re Disciplinary Matter Involving Schuler*, 818 P.2d 138, 139 (Alaska 1991); *In re Fioramonti*, 859 P.2d 1315, 1320 (Ariz. 1993); *In re Fischer*, 89 P.3d 817, 819–20 (Colo. 2004); *Office of Chief Disciplinary Counsel v. Skyers*, No. CV106010993S, 2010 WL 5188432, at *3 (Conn. Super. Ct. Nov. 30, 2010); *In re Steiner*, 817 A.2d 793, 796 (Del. 2003) (per curiam); *In re Swindall*, 468 S.E.2d 372, 372–73 (Ga. 1996) (per curiam); *Office of Disciplinary Counsel v. Au*, 113 P.3d 203, 217 (Haw. 2005) (per curiam); *In re Burchett*, 630 N.E.2d 205, 206 (Ind. 1994) (per curiam); *In re Matney*, 811 P.2d 885, 887 (Kan. 1991) (per curiam); *Anderson v. Ky. Bar Ass'n*, 262 S.W.3d 636, 639 (Ky. 2008); *In re Cardenas*, 60 So. 3d 609, 613 (La. 2011) (per curiam); *In re Bulger*, No. 2013–14, 2013 WL 7876129, at *2 (Mass. State Bar Disciplinary Board Dec. 4, 2013); *Att'y Grievance Comm'n of Md. v. West*, 836 A.2d 588, 597 (Md. 2003); *Grievance Adm'r v. Lopatin*, 612 N.W.2d 120, 123 (Mich. 2000); *In re Disciplinary Action Against Rooney*, 709 N.W.2d 263, 270 (Minn. 2006) (per curiam); *Stegall v. Miss. Bar*, 618 So. 2d 1291, 1295 (Miss. 1993) (en banc); *In re Forck*, 418 S.W.3d 437, 442 (Mo. 2014) (en banc); *In re Discipline of Hatcher*, No. 68702, 2016 WL 3309678, at *2 (Nev. June 14, 2016); *In re Wolterbeek's Case*, 886 A.2d 990, 993 (N.H. 2005); *In re Yalkut*, 176 P.3d 1119, 1127 (N.M. 2008) (per curiam); *Cleveland Bar Ass'n v. Briggs*, 728 N.E.2d 1049, 1051 (Ohio 2000) (per curiam) (Cook, J., dissenting); *In re Conduct of Koliha*, 9 P.3d 102, 104 (Or. 2000) (en banc) (per curiam); *In re Pier*, 561 N.W.2d 297, 299 (S.D. 1997); *Bailey v. Bd. of Prof'l Responsibility*, 441 S.W.3d 223, 234 (Tenn. 2014); *In re Cassity*, 875 P.2d 548, 550 (Utah 1994); *In re Strouse*, 34 A.3d 329, 334 (Vt. 2011) (per curiam); *In re Burgess*, No. 92–00–1493, 1992 WL 811107, at *4 (Va. State Bar Disciplinary Board Nov. 24, 1992); *In re Disciplinary Proceeding Against Haley*, 126 P.3d 1262, 1269 (Wash. 2006); *Bd. of Prof'l Responsibility v. Abraham*, 376 P.3d 483, 487 (Wyo. 2016). Other states have modeled their standards for imposing discipline after the ABA's standards. *See, e.g.*, *In re Disciplinary Action Against Kirschner*, 793 N.W.2d 196, 201 (N.D. 2011) (per curiam).

4.13 Reprimand is generally appropriate when a lawyer is negligent in dealing with client property and causes injury or potential injury to a client.

4.14 Admonition is generally appropriate when a lawyer is negligent in dealing with client property and causes little or no actual or potential injury to a client.

Standards for Imposing Lawyer Sanctions § 4.1 (Am. Bar Ass'n 1992).

The standards recognize the following factors as aggravating and mitigating:

9.0  Aggravation and Mitigation

9.1  Generally

    After misconduct has been established, aggravating and mitigating circumstances may be considered in deciding what sanction to impose.

9.2  Aggravation

    9.21 Definition. Aggravation or aggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed.

    9.22  Factors which may be considered in aggravation.

        Aggravating factors include:

        (a)  prior disciplinary offenses;

        (b)  dishonest or selfish motive;

        (c)  a pattern of misconduct;

        (d)  multiple offenses;

        (e) bad faith obstruction of the disciplinary proceeding by intentionally failing to comply with rules or orders of the disciplinary agency;

        (f) submission of false evidence, false statements, or other deceptive practices during the disciplinary process;

        (g) refusal to acknowledge wrongful nature of conduct;

(h) vulnerability of victim;

(i) substantial experience in the practice of law;

(j) indifference to making restitution;

(k) illegal conduct, including that involving the use of controlled substances.

9.3 Mitigation

9.31 Definition. Mitigation or mitigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed.

9.32 Factors which may be considered in mitigation.

Mitigating factors include:

(a) absence of a prior disciplinary record;

(b) absence of a dishonest or selfish motive;

(c) personal or emotional problems;

(d) timely good faith effort to make restitution or to rectify consequences of misconduct;

(e) full and free disclosure to disciplinary board or cooperative attitude toward proceedings;

(f) inexperience in the practice of law;

(g) character or reputation;

(h) physical disability;

(i) mental disability or chemical dependency including alcoholism or drug abuse when:

(1) there is medical evidence that the respondent is affected by a chemical dependency or mental disability;

(2) the chemical dependency or mental disability caused the misconduct;

(3) the respondent's recovery from the chemical dependency or mental disability

is demonstrated by a meaningful and sustained period of successful rehabilitation; and

(4) the recovery arrested the misconduct and recurrence of that misconduct is unlikely.

(j) delay in disciplinary proceedings;

(k) imposition of other penalties or sanctions;

(l) remorse;

(m) remoteness of prior offenses.

9.4 Factors which are neither aggravating nor mitigating.

The following factors should not be considered as either aggravating or mitigating:

(a) forced or compelled restitution;

(b) agreeing to the client's demand for certain improper behavior or result;

(c) withdrawal of complaint against the lawyer;

(d) resignation prior to completion of disciplinary proceedings;

(e) complainant's recommendation as to sanction;

(f) failure of injured client to complain.

*Id.* §§ 9.0–9.4. Applying these factors, the majority should reexamine its sanction under standard 4.11.

Morse knowingly converted the funds and caused client harm. As the Board set forth in its brief,

[Morse] testified that he believed the Stephenson's appeal had merit. In the end however the appeal was dismissed based on [Morse]'s misconduct. He failed to forward the Stephenson's $1,400 payment to the court reporter in a timely manner. In fact, he testified he purposefully held the funds in his trust account because the Stephensons had not paid their legal fees. Additionally, [Morse] had the opportunity and did nothing to bring to the

Court's attention the error in its dismissal order stating the Stephenson's $1,400 check had been returned for non-sufficient funds.

Respondent's misconduct directly harmed the Stephenson's because their appeal was dismissed and they were forever barred from challenging the trial court's ruling. As the Stephensons stated in their complaint affidavit to the board, "Unfortunately because Dave Morse did not send the money to the court reporter, the case was dismissed by the Iowa Supreme Court and we had to pay more to these two other companies then (sic) we owed by thousands."

The majority says there was harm to the client, but it is minimal and for this reason, Morse should only get a light suspension. I disagree. Losing the right to appeal is great harm. The right to appeal is fundamental to due process of law. The majority also concedes the district court made a math error of $1708 and acknowledges that amount would be recoverable on an appeal, but then offsets that amount against the cost of the transcript. What the majority does not realize is that if the Stephensons were successful on appeal, we would assess the costs of the appeal, including the cost of the transcript, against the other side. Additionally, $1708 may not mean much to the majority, but to persons in the Stephensons' financial situation it is a great sum of money.

If the majority would use the objective factors of the ABA's *Standards for Imposing Lawyer Sanctions*, the sanction against Morse would surely be more than a thirty-day suspension. The court should stop using the legal and illegal stealing dichotomy when sanctioning a lawyer for conversion. For these reasons, I dissent as to the sanction.